FILED
UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

FEB 10 2003

[signature]
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MELISSA PARSONS,

    Plaintiff,

vs.                                      Civ. No. 01 CV 1347 JP/RLP

JO ANNE B. BARNHART, COMMISSIONER
OF SOCIAL SECURITY,

    Defendant.

## UNITED STATES MAGISTRATE JUDGE'S
## ANALYSIS AND RECOMMENDED DISPOSITION[1]

1.    Plaintiff, Melissa Parsons, filed an application for Supplemental Security Income Benefits on May 6, 1994, alleging disability as of February 1, 1990, due to fatigue following surgical removal of her thyroid, depression and inability to sleep. Her application was denied at the first and second levels of administrative review, and by an Administrative Law Judge (ALJ) following a hearing. Plaintiff appealed the ALJ's decision to the Appeals Council which declined review. Plaintiff filed suit in District Court on May 22, 1998. The case was remanded to the Commissioner on January 22, 1999, with instructions to obtain vocational evidence, update the medical record, and obtain additional examinations. A second hearing before the same ALJ was conducted on February 17, 2001. The ALJ issued an amended unfavorable decision on July 31, 2001. The matter before this Court is Plaintiff's Motion to Reverse or Remand the decision of the Commissioner denying benefits. For the reasons stated below, I recommend that Plaintiff's Motion be granted.

---

[1]Within ten (10) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. §636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten (10) day period if that party seeks appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

## I.   Standard of Review

2.     This Court reviews the Commissioner's decision to determine whether the record contains substantial evidence to support the findings, and to determine whether the correct legal standards were applied. *Castellano v. Secretary of Health & Human Services*, 26 F.3d 1027, 1028 (10th Cir.1994). Substantial evidence is " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Soliz v. Chater*, 82 F.3d 373, 375 (10th Cir.1996) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). In reviewing the Commissioner's decision, the court cannot weigh the evidence or substitute its discretion for that of the Commissioner, but I have the duty to carefully consider the entire record and make my determination on the record as a whole. *Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir.1987).

## II.   Vocational and Medical Facts

3.     Plaintiff was born on November 5, 1969. She completed the 10th grade and subsequently obtained a GED. She worked as a maid for a commercial maid service from September 1993 to January 1994, in an apartment laundry room from September to November 1998, cared for an elderly man one day per week from August to November 1999, and babysat for her sister's children 20 hours per week from September to December 2000. (Tr. 769). The ALJ determined that none of the activities constituted gainful activity.

5.     Plaintiff's thyroid was surgically removed to treat thyroid cancer in February 1990. Additional surgery was required to remove retained thyroid tissue. Her thyroid hormone levels have been monitored and supplemented, necessitating frequent changes in medication dosage. (See, e.g., Tr. 303, 302, 277, 115, 300, 299, 298, 440, 438, 296, 427,

432, 295, 426, 594, 692, 766-767).

5. Plaintiff was evaluated for suicidal ideation or attempted suicide on seven occasions between August 4, 1991, and January 23, 1999. She has been treated by several physicians for depression, a sleep disorder, bipolar disorder and obsessive compulsive disorder.

6. On August 8, 1991, Plaintiff was brought to the University of New Mexico Mental Health Center by police. She had run away from a bar after fighting with her boyfriend over his plans to leave her. She admitted to vague homicidal and suicidal thoughts, but denied any plan or intent. She was released after evaluation. (Tr. 411-412).

7. In August of 1993 Dr. Ronald Tatum, Plaintiff's treating endocrinologist, noted her complaints of severe depression. He prescribed Paxil and referred her to a Dr. Karp, (Tr. 273). Dr. Karp's specialty is not indicated, nor were his records obtained. Plaintiff apparently saw Dr. Karp, as she reported to Dr. Tatum that she did not like him. (Tr. 302). Over the course of the next eleven months Dr. Tatum prescribed Amitriptyline (Elavil), Zoloft and Paxil to treat depression. (Tr. (Tr. 302, 301, 298).

8. On June 14, 1994, Plaintiff was admitted to the ICU under suicide precautions following an overdose of Amitriptyline. Urine drug screening detected ethanol, but no other drug or substance. (Tr. 180). Plaintiff stated that her suicide attempt resulted from domestic problems. (Tr.131). She was diagnosed with Adjustment disorder of adult life with fixed disturbance of mood and conduct (Axis I), with a Global Assessment of Functioning (GAF) of 25 on admission, and 75 over the prior year.[2] (Tr. 132). She was

---

[2] See Appendix A for a chart of Plaintiff's GAF scores.

3

advised to continue taking Amitriptyline and Paxil. Id.

9. On July 5, 1994, Plaintiff was again admitted to the ICU for an overdose of Amitriptyline. No other drugs were detected on urine drug screen. (Tr. 215). Plaintiff remained hospitalized until July 11, receiving psychotherapy and counseling. She attributed her depression and suicide attempt to her husband's drug use. (Tr. 236). Her symptoms resolved rapidly, leading her treating psychiatrist to note "Rapid remission suggests this is not Major Dep. Probable (personality disorder)/ dysthymia." Id. Her discharge diagnoses included Dysthymic Disorder (Axis I); Mixed Personality Disorder with cluster B features (Axis II) with a GAF of 10 on admission, 75 for the prior year (Axis V). (Tr. 225).

10. Starting in July 1994 Plaintiff was seen by Robert Kellogg, M.D., a psychiatrist. (Tr. 438, 266-274). Her symptoms included excessive sleeping, obsessive/compulsive thoughts and hearing voices. Dr. Kellogg treated her with increasing dosages of Prozac, eventually switching to Luvox.[3]

11. Plaintiff reported her excessive sleeping to Dr. Tatum as well. (Tr. 436, 294). In February 1995 he referred her to Dr. Daniel Pennington, a specialist in sleep disorders. (Tr. 432). Dr. Pennington evaluated Plaintiff in March and April 1995. Overnight sleep testing was conducted in April, the results of which were not available until mid-May. (Tr. 442).

---

[3] Dr. Tatum noted that Dr. Kellogg had started Plaintiff on Prozac on July 22, 1994. On May 5, 1994, Dr. Kellogg increased Plaintiff's dosage of Prozac to 40 mg qd (Tr. 275-277); on October 10 the dosage was increased to 60 mg. qd. (Tr. 269); on October 25 the dosage was increased to 80 mg. qd. (Tr. 267). Additional records from Dr. Kellogg are missing from the Administrative record. In a History and Physical dated May 15, 1995, he is identified as Plaintiff's treating physician for past past year. (Tr. 452). At some point he increased Plaintiff's dosage of Prozac to 100 mg. per day. Id. Because she had no significant benefit from this level of Prozac, Dr. Kellogg tapered her off Prozac and started Luvox. (Tr. 452).

4

12.     On May 13, 1995 Plaintiff was admitted to the ICU following an overdose of Benadryl. (Tr. 413). She was subsequently admitted for voluntary inpatient care, under the care of Dr. David Friar.  (Tr. 452-454).  She reported depression with hypersomnia (sleeping 16-18 hours per day), constant fatigue, no appetite and anhedonia, stating that she had felt this way for about four months.  Tr. 452).  On admission she was diagnosed as suffering from Depressive Disorder nos (Axis I) with a current GAF of 45, and a past year GAF of 55 (Axis V).  (Tr. 454).  No discharge summary or laboratory findings for this hospitalization are contained in the administrative record.

13.     Dr. Pennington saw Plaintiff on June 1, 1995, to discuss the results of her sleep study, which had revealed a periodic leg movement disorder that contributed to sleep deprivation and daytime sleepiness.  He recommended use of Restoril, a sleeping medication, to address this problem.  (Tr. 441).

14.     Dr. Friar saw Plaintiff on June 2 and July 12, 1995.  (Tr. 451, 450).  He documented decreased need for sleep and increased daily functioning.[4]  On July 12 he referred her back to Dr. Tatum for medication management.

15.     On June 16, 1997, Dr. Tatum wrote a letter to the Social Security Administration stating that over the past seven years Plaintiff had suffered from "severe bouts of depression, making her unable to perform properly at work." (Tr. 465).

16.     Plaintiff's primary care provider changed to Dr. Eisberg in November 1997.  In his

---

[4]"Since starting Luvox after getting out of the hospital, her mood has improve a little bit. She is still sleeping a lot, but not nearly as much as before.  On an ordinary night she will go to sleep at 12:30 and awake at 8:30.  She may or may not take some naps during the day depending on what her schedule is like.  Unlike previously, she is now doing errands, housework, cleaning and cooking."  (Tr. 451).

5

initial office note he stated:

> She also has been treated by a psychiatrist for obsessive compulsive and depressive behavior. She has been doing quite well with Luvox 100 mg. with no side effects. . . She is feeling quite well. No other problems (except weight loss). She feels fine and so we will just see her back on follow up in the early part of January . . . (Tr. 697).

17.  On May 18, 1998, Plaintiff was admitted to the hospital after another suicide attempt precipitated by lack of energy, depression, and caring for her children after her boyfriend had left them five months before. (Tr. 703, 709, 713). She also complained of hearing voices. After urine screening disclosed evidence of marijuana use, she admitted that she had used marijuana on a daily basis for several years in order to relax. (Tr. 705). She gradually improved during the hospitalization, and was discharged with instructions to obtain further psychiatric care at an out-patient counseling center. (Tr. 704). Her discharge diagnosis included Major Depression and Cannabinoid dependency (Axis I) with admission GAF of 25-30 and discharge GAF of 55-60 (Axis V). (Tr. 702). Discharge medications included Luvox for depression and Risperdal, an anti-psychotic medication. (Tr. 704). Plaintiff began receiving counseling at RHOC, Inc., in May 1998. (Tr. 663-670).

18.  Plaintiff was seen in the emergency room on July 30, 1998, complaining of thoughts of suicide that had surfaced over the past week, sleeping most of the day, lack of energy, listlessness, poor concentration. She reported that she had been prescribed Depakote in addition to Luvox and Restoril, and admitted to using marijuana four times a day for the past three years.[5] She was evaluated by a psychiatric liaison who recommended drug

---

[5] The treatment notes states "Pt has been started on new meds regimen (+). Given significant marijuana use, these meds have not been able to reach maximum effectiveness. " (Tr. 717).

6

counseling, but did not think she was acutely suicidal. She was discharged after receiving Ativan. (Tr. 715-718).

19. Plaintiff was seen by Dr. Eisberg on September 22, 1998, for follow up on her thyroid condition and for lumbar sacral strain that developed after she had "done a lot of work in the laundry room with mopping and sweeping and lifting." (Tr. 685). Three months later he wrote:

> Melissa has had seasonal depression for quite a number of years. She had done quite well with no side effects. She is given Luvox 100 mg. by Dr. Tatum. This has helped her sleep and mood, and she has had no problems with this in the past. I will go ahead with Luvox 100 mg hs. She does not need any counseling since this is a seasonal problem and gives him (sic) an endogenous type of depression.

(Tr. 684).

20. On January 23, 1999, Plaintiff was admitted to the hospital for severe depression with suicidal ideation, intent and plan. (Tr. 721, 724). She had stopped both counseling and medications six month before, and had separated from her husband three weeks before. (Tr. 719, 723). She complained of decreased appetite and energy, increased sleep, and lack of concentration. (Tr. 723). Although she denied drug and/or alcohol use (Tr. 723), cannabinoids were again detected on urine drug screening. (Tr. 727). She was restarted on Luvox. (Tr. 719). Over a three day period her symptoms abated, and on discharge she was described as much improved with a diagnosis of Bipolar disorder, depressed (Axis I) and GAF of 60, highest in past year 75. (Tr. 719-720).

21. Plaintiff returned to Dr. Kellogg in February 1999. They discussed her recent hospitalization, and she complained of continued low mood, lack of interest and motivation, suicidal ideation without intent, low energy and sleeping 15-16 hours daily while being up

at night, and obsessive thoughts. She denied drug use. Dr. Kellogg diagnosed Adjustment Disorder, bipolar, depressed and anxiety with obsessive compulsive disorder. He continued Plaintiff on Luvox and Depakote, and added Remeron for sleep and depression. (Tr. 732). By March 11, 1999, Plaintiff reported improvement, stating that her sleep needs had decreased to 12 hours daily, 8 hours at night and 4 hours during the day. She also reported that her concentration and appetite had improved and her suicidal ideation had decreased. He continued her on the same medications. (Tr. 730). On April 1, 1999, Plaintiff reported irritable mood and low energy. She indicated that she had felt significantly improved while taking Remeron, which she had run out of two weeks before. Dr. Kellogg restarted Remeron, continued Luvox, and increased her dosage of Depakote. (Tr. 730). By April 29, 1999, Plaintiff reported feeling significantly improved with increased interest, mood and concentration and decreased need for sleep. Dr. Kellogg noted that her affect had improved. (Tr. 729). By June 3, 1999, however, Plaintiff again complained of a drop in mood and energy, and an increase in obsessive compulsive symptoms and anxiety. Dr. Kellogg increased her dosage of Remeron. (Tr. 729).

22.     As of July 27, 1999, Plaintiff's psychiatric care was transferred to Nancy Schiess. D.O. Dr. Schiess interviewed Plaintiff and performed a mental status exam, which was essentially normal[6]. (Tr. 744)

23.     Plaintiff was admitted to the hospital on August 26, 1999, for treatment of

---

[6]Plaintiff was alert and oriented x 4, had normal language function, sad mood when discussing her boyfriend's hesitancy to marry, congruent affect was congruent with some tears when discussing her disappointment, linear and logical thought process with no suicidal or homicidal ideation, normal sensory perceptions, average intellect, normal attention span and memory and congruent insight/judgment. (Tr. 746).

8

pancreatitis caused by high levels of calcium. She was taken off psychiatric medications, which were possibly contributory to her high calcium levels. (Tr. 749, 752, 748, 679). Those medication were restarted on September 1 by Dr. Schiess, who noted that Plaintiff's bipolar disorder was stable. (Tr. 744).

24. Plaintiff attended counseling sessions in October and November 1999. (Tr. 651-657). Her case manager, Andrea Johnston, M.A., LPC, stated

> It has come to the attention of this case manager that this client is not always honest about her social environment and her ability to comply with treatment . . . Client has been in denial about her illness. It appears that with this last episode of mania that this client recognizes the potential problems if she discontinues her medication.

(Tr. 656-657).

25. Anthony Traweek, PhD, conducted a psychological consultative examination on November 30, 1999. (Tr. 563-573). Dr. Traweek was not provided with any records to review in connection with his evaluation. He took a detailed history, conducted a mental status exam, and administered the WAIS-III intelligence test. The following is a summary of his report:

History:

Plaintiff denied any history of illegal drug use. (Tr. 565). In terms of daily activities, she indicated that she typically awakened at 6:30 am, napped from 9 a.m. to noon, and went to bed at 7:30- 8:00 p.m.; she cared for her personal hygiene needs, dressed without assistance, laundered and ironed her clothes without difficulty, cooked for herself and her family, performed some small house maintenance, drove on occasion, watched tv and made cash transactions reliably and predictably. (Tr. 566). She denied having any friends (id.), and stated that she had never been able to handle stress. (Tr. 567). She attributed her past disruptive, violent behavior and auditory hallucinations to periods when she was not taking her medication, stating that medication was critical and essential to maintaining her psychiatric stability. (Tr. 567-568).

9

Mental Status Exam:

- Alert, lucid and responsive at all times.
- Oriented x 4
- General demeanor friendly and cooperative, yet she was reserved and distant at all times
- Physiological responses apparent in slight sweating and increased respirations
- Thought process logical, goal-directed and coherent.
- Thought content and perceptual ability within normal limits.
- No evidence or report of illusions, ideas of reference, delusions, hallucinations obsessions, compulsions, phobias or neologisms.
- Level of intellectual functioning appeared below average.
- Immediate memory intact.
- Concentration, mental control, judgement and decision making appeared adequate.
- Mood described as mildly depressed with clear anhedonia, social withdrawal and isolation.
- Neuro-vegetative symptoms of depression, which include sleep disturbance, relatively well controlled while on psychotropic medication.
- Increased libido.
- Chronic psychomotor retardation suggested by lethargy, listlessness and fatigue.
- Psychomotor agitation suggested by periodic restlessness, pacing and fidgetiness.
- No current suicidal or homicidal ideation, but long history of multiple overdose attempts, the last in February 1999.
- Affect clearly constricted with no evidence of humor. Presentation was serious, tense and distant. (Tr. 568-569).

WAIS-III Results:

Borderline intellectual functioning with Verbal IQ - 80; Performance IQ - 81; Full Scale IQ - 79. (Tr. 569).

26.     Dr. Traweek diagnosed Bipolar I Disorder, mixed, with mood congruent psychotic features, chronic, in remission secondary to use of medication, borderline intellectual functioning with a current and past year GAF of 50. In terms of Plaintiff's ability to carry out sustained work related activities, Dr. Traweek stated:

Ms. Parsons has a chronic and serious psychiatric condition requiring

10

> medication to modulate severe symptomatology.  Historically, she has not been able to maintain employment as her symptom pattern fluctuates and interferes with employability.  Currently, her ability to understand and remember very short and simple instructions appears to not (be) limited. Her ability to understand and remember detailed or complex instructions appears moderately limited.  Her ability to sustain concentration and task persistence to carry out instructions appears mildly limited.  Her ability to work without supervision appears not limited.  Her ability to interact appropriately with coworkers, supervisors and the public appears moderately to markedly limited.  Her ability to adapt to changes in the workplace appears mildly to moderately limited  Her ability to be aware of normal hazards and react appropriately appears mildly limited.  Her ability to use public transportation or travel to unfamiliar places appears mildly limited.  There does not appear to be an alcohol problem or other substance abuse problem which would interfere with her ability to function in a work setting at this time.

(Tr. 571).

27. On April 21, 2000, Plaintiff reported to Dr. Schiess that she was doing well with no depressive symptoms. Dr. Schiess indicated that her bipolar disorder was stable, that her GAF was 75 currently and for the past year. She advised Plaintiff to seek part time employment. (Tr. 734-735).

28. Eugene Toner, M.D., conducted a consultative medical evaluation on Plaintiff on June 5, 2000. She complained to him of significant lack of energy and weight gain. Her physical examination was unremarkable except for acute bronchitis. Dr. Toner felt that her lethargy could be secondary to psychiatric problems. He stated that aside from sustainability of effort, she should be able to physically perform tasks considered normal for her age, size and sex. (Tr. 576-577).

29. Plaintiff's psychiatric care was transferred to Dr. Rene Gonzalez, who initially evaluated her on September 15, 2000. Dr. Gonzalez diagnosed bipolar disorder, history of marijuana/ETOH abuse (Axis I) with a current GAF of 50, and past year GAF of 65. (Tr. 778-779). Plaintiff was seen by Dr. Gonzalez monthly thereafter. She adjusted Plaintiff's

antidepressant medications, eventually discontinuing Depakote, continuing Luvox and adding Trazodone and Wellbutrin, both antidepressants. (Tr. 774). On January 12, 2001, Dr. Gonzalez noted that Plaintiff was showing much progress, had been under a lot of stress, and was handling it well. (Tr. 773). On February 16, 2001, Dr. Gonzalez added Risperdal to treat symptoms of paranoia. (Tr. 772, 781). Within days Plaintiff noted an increase in energy, but also negative side effects including fear, anxiety, tremor and strange bodily sensations, difficulty sleeping and increased photosensitivity. (Tr. 781). Risperdal was discontinued within weeks, and replaced by an unidentified medication. (Tr. 780).

III.    Analysis

30.    The Social Security regulations provide a five-step sequential evaluation process for determining whether a claimant is disabled. *Reyes v. Bowen*, 845 F.2d 242, 243 (10th Cir.1988); §20 C.F.R. 416.920. The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. *Sorenson v. Bowen*, 888 F.2d 706, 710 (10th Cir.1989).

31.    In denying Plaintiff's claim, the ALJ found that aside from the effects of drug abuse, she had failed to establish a severe underlying mental condition that had more than a minimal impact on her ability to perform work related functions.[7] Although he did not cite to it by title,

---

[7] "I specifically find that the claimant has not bet her burden of demonstrating . . . that she has experienced more than a minimal impact on her capacities for work related functioning due to any severe underlying mental condition aside from the effects of her drug abuse. . . I find that the claimant's mental condition has been controlled with medications except for periods of exacerbation during noncompliance with medications, marijuana abuse and personal problems at home. She has not met her burden of demonstrating that she has experienced any significant restriction of her activities of daily living, her social functioning, her capacities for attention and concentration or her capacity for tolerating work related stress due to any severe underlying mental condition aside from the effects of marijuana abuse." (Tr. 516, 518).

12

this finding necessarily involves application of the Contract with America Advancement Act, Pub. L. No. 104-121, 110 Stat. 847 (March 29, 1996), which provides:

> An individual shall not be considered to be disabled for purposes of [benefits under Title II or XVI of the Act] if alcoholism or drug addiction would (but for this paragraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.

§§42 U.S.C. 423(d)(2)(C), 1382c(1)(3)(J).

After dismissing all of Plaintiff's alleged mental impairments, the ALJ somewhat inconsistently found that she was limited to "simple, routine, low stress work activities. . . which do not involve dealing with the public." (Tr. 518).

32. In *Drapeau v. Massanari*, 225 F.3d 1211(10th Cir. 2001), the Tenth Circuit held that it was error for the ALJ to consider the impact of the claimant's alcohol abuse before deciding whether the claimant was disabled.

> The ALJ's analysis of plaintiff's alcohol abuse was flawed in several respects. First, the ALJ failed to determine whether the plaintiff was disabled prior to finding that alcoholism was a contributing factor material thereto. The implementing regulations make clear that a finding of disability is a condition precedent to an application of §423(d)(2)(C). 20 C.F.R. §416.935(a). The Commissioner must first make a determination that the claimant is disabled. *Id.* He must then make a determination whether the claimant would still be found disabled if he or she stopped abusing alcohol. *Id.* §416.935(d)(1). If so, then the alcohol abuse is not a contributing factor material to the finding of disability. *Id.* §416.935(b)(2)(ii). If, however, the claimant's remaining impairments would not be disabling without the alcohol abuse, then the alcohol abuse is a contributing factor material to the finding of disability. *Id.* §416.935(b)(2)(i). The ALJ cannot begin to apply §423(d)(2)(C) properly when, as here, he had not made a finding of disability.

*Drapeau v. Massanari*, 225 F.3d at 1214-1215.

33. Additionally, I find that substantial evidence does not support the ALJ's conclusion that Plaintiff's non-drug related mental impairments are non-severe. To be termed "non-severe," an impairment must be so slight that it could not interfere with or have a serious impact on

13

the claimants ability to do work related activities. The claimant is only required to make a *de minimus* showing of medical severity. *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988).

34. At a very minimum, the medical record establishes that Plaintiff has a documented sleep disorder which contributed to sleep deprivation and daytime sleepiness. This condition took months if not years to diagnose. Even if Plaintiff's sleep disorder was resolved by use of medication, the ALJ should have considered whether it produced a closed period of disability. Instead, the ALJ completely ignored Plaintiff's sleep disorder and its impact on her residual functional capacity.

35. The ALJ's decision is predicated on the assumption that Plaintiff abused drugs, specifically marijuana, at all times material to her claim. The record does not bear this out. Plaintiff underwent drug screening at the time of her June 14, 1994, and July 15, 1994 suicide attempts. No illicit drugs were detected.

36. Finally, Dr. Tatum and every psychiatrist or psychologist who examined Plaintiff, found mental problems significant enough to meet the "severity" criteria applicable to step two of the sequential evaluation process.

37. Based on the foregoing, I find that the ALJ applied incorrect legal principles when he considered the impact of Plaintiff's drug use prior to determining whether she was disabled. I further find that substantial evidence does not support the ALJ's determination that apart from drug use/abuse, Plaintiff had no "severe" mental impairments.

VI. Recommended Disposition

38. For the reasons stated herein, I recommend that Plaintiff's Motion to Reverse or

Remand be granted, and that this matter be remanded to the Commissioner for additional proceedings consistent with this Analysis and Recommended Disposition, to include:

    A.    Re-evaluation of Plaintiff's diagnosed mental impairments;

    B.    Consideration of the impact of Plaintiff's documented sleep disorder, and whether that disorder produced a closed period of disability.

    C.    Proper application of the Contract With America Advancement Act.

RICHARD L. PUGLISI
UNITED STATES MAGISTRATE JUDGE

Appendix A
Melissa Parsons
Global Assessment of Functioning (GAF) Scores

| Date/Tr. | Evaluator | | Interpretation[8] |
|---|---|---|---|
| 6/14/94<br>Tr. 132 | Jay Feierman, M.D. | On admission: 25 | Behavior considerably influenced by delusions or hallucinations, or serious impairment in communication or judgement, or inability to function in almost all areas. |
| | | Past year: 75 | Transient or expectable reactions to psychosocial stressors, no more than slight impairment in social, occupational or school functioning. |
| 7/5/94<br>Tr. 225 | Jay Feierman, M.D. | On admission: 10 | Persistent danger of severely hurting self or others . . . or serious suicidal act with clear expectation of death. |
| | | Past year: 75 | Transient or expectable reactions to psychosocial stressors, no more than slight impairment in social, occupational or school functioning. |
| 5/15/95<br>Tr. 454 | David Friar, M.D. | On admission: 45 | Serious symptoms or any serious impairment in social, occupational or school functioning. |
| | | Past year: 55 | Moderate symptoms or moderate difficulty in social, occupational or school functioning. |
| 5/18/98<br>Tr. 702 | P. Bakhtiar, M.D. | On admission: 25-30 | Behavior considerably influenced by delusions or hallucinations, or serious impairment in communication or judgement, or inability to function in almost all areas. |
| | | On discharge: 55-60 | Moderate symptoms or moderate difficulty in social, occupational or school functioning. |

---

[8] Summarized from the *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Ed., p. 32.

16

| Date | Evaluator | | | Interpretation |
|---|---|---|---|---|
| 1/23/99 Tr. 720 | Thomas Reichenbacher, M.D. | On discharge: | 60 | Moderate symptoms or moderate difficulty in social, occupational or school functioning. |
| | | Past year: | 75 | Transient or expectable reactions to psychosocial stressors, no more than slight impairment in social, occupational or school functioning. |
| 11/30/99 Tr. 570 | Anthony Traweek, PhD. | On admission: Past year: | 50 50 | Serious symptoms or any serious impairment in social, occupational or school functioning. |
| 4/21/00 Tr. 735 | Nancy Schiess, D.O. | Current: Past year: | 75 75 | Transient or expectable reactions to psychosocial stressors, no more than slight impairment in social, occupational or school functioning. |
| 9/15/00 Tr. 779 | Rene Rodriguez, M.D. | Current: | 50 | Serious symptoms or any serious impairment in social, occupational or school functioning. |
| | | Past year: | 65 | Some mild symptoms or some difficulty in social, occupational or school functioning, but generally functioning pretty well, with some meaningful interpersonal relationships. |

17